THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYMOND SERIO, Defendant-Appellant.

Second District   No. 2—03—0814

Opinion filed June 3, 2005.—Rehearing denied June 30, 2005.

G. Joseph Weller and Jack Hildebrand, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz and Joan M. Kripke, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BYRNE delivered the opinion of the court:

Following a jury trial, defendant, Raymond Serio, was convicted of first-degree murder (720 ILCS 5/9—1 (West 2002)) and sentenced to 50 years' imprisonment. Defendant appeals, arguing that the trial court erroneously (1) denied his motion to suppress his confession because the police allegedly violated his fourth amendment rights by stopping a taxi in which he was riding and detaining him for 14 hours at the police station and (2) failed to dismiss his first notice of appeal and then consider his posttrial motion alleging ineffective assistance of counsel. Defendant contends that he is entitled to a new hearing in the trial court to prove that the allegedly illegal detention requires suppression of the confession. Defendant further argues that he is entitled to further consideration of his posttrial claim of ineffective assistance of counsel. We conclude that the trial court did not abuse its discretion in admitting defendant's confession but that a remand to the trial court for the consideration of his ineffective assistance claim is necessary. Therefore, we remand the cause for proceedings consistent with this disposition.

## FACTS

On January 6, 2002, Richard Neubauer's body was discovered in his mother's car, which was parked in Wisconsin at the front gate of the Bristol Renaissance Faire near the Lake County, Illinois, border. Neubauer had suffered three gunshot wounds to the head. On April 4, 2002, the police stopped defendant, transported him to the police station for an interview, and released him later that day. Defendant was arrested two days later and subsequently charged with first-degree murder, based on the theory that he had ordered his friend and codefendant, Ronald Ruhl, to shoot Neubauer.

On April 23, 2002, defendant filed his first of two motions to suppress the incriminating statement he made to the police on April 4. The first motion asserted that defendant neither waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), nor made his statement voluntarily.

At the hearing on the first motion to suppress, defendant testified that he and Amanda Barbaro stayed at the Best Western hotel in Antioch on April 3, 2002. Defendant had allegedly ingested Thorazine to treat his symptoms of withdrawal from heroin. At approximately 3:30 a.m. on April 4, 2002, defendant and Barbaro summoned a taxi and left the hotel to purchase heroin because they felt ill. After they drove about one-half mile from the hotel, the taxi was stopped by the police, who directed defendant to exit the taxi and walk backwards toward them. At 3:40 a.m., defendant was taken to the Lake County sheriff's office, where he was searched and placed in an interview room. Defendant asked a deputy why he had been taken to the station, and the deputy responded that someone would talk to defendant about the situation. After sitting in the interview room for three to four hours, defendant knocked on the door to summon a deputy and again asked why he was detained. The deputy replied that he did not know. Defendant was later taken to a different interview room where Lake County Deputy Sheriff Timothy Jonites and Detective Scott Stanek of the Kenosha County sheriff's department informed defendant that two people had identified him as Neubauer's killer. Defendant stated that he wished to speak to an attorney, and the detectives left the room.

Defendant further testified that he heard Barbaro vomiting and calling him from an adjacent interview room. Barbaro said that she was sick and wished to leave, and defendant wanted to help her. The detectives moved Barbaro, and defendant told them that he wished to see her. The detectives then told defendant, "[w]ell, if you help us, we can help you." Another officer entered the interview room and showed defendant a pair of his blood-splattered boots that had been seized. Deputy Jonites told defendant that he could receive the death penalty, and defendant became scared and confused. Defendant agreed to make a statement, and at that point, defendant had been at the station for 12 hours. As a result of the conversation, defendant believed that, in exchange for his statement, the detectives would allow him to leave that evening and the State would not seek the death penalty if defendant were ultimately charged.

On cross-examination, defendant admitted that he had been previously convicted of burglary, deceptive practices, and unlawful use of weapons. Defendant had begun snorting heroin approximately one week after Neubauer's death. Defendant ingested Thorazine on April 4, 2002, to "numb" himself and curb his heroin addiction. He obtained the Thorazine from his mother, and no doctor had prescribed it for him. Defendant estimated that he ingested 10 to 12 Thorazine pills from 7:30 p.m. on April 3 until 3:30 a.m. on April 4, when the police

stopped his taxi. Although defendant equivocated, he generally asserted that the Thorazine made him feel drowsy and slurred his speech. Defendant conceded that he understood and initialed each of the *Miranda* warnings he received before making his statement. The officers' mention of the death penalty "definitely played a factor" in defendant agreeing to provide a statement, and he believed that he only would be asked to testify as a witness. However, defendant conceded that, at the conclusion of his videotaped statement, he said that the police had not made any threats or promises.

Deputy Jonites testified that, as part of his investigation of Neubauer's death, he met with defendant at the Lake County sheriff's office on April 4, 2002. Defendant was placed in an interview room, but Jonites opined that defendant was not in custody at that time. While awaiting the interview, defendant requested and received restroom breaks and cigarettes. Barbaro, Denise Schubat, and codefendant Ruhl were each placed in interview rooms adjacent to defendant's room. Jonites and Stanek began interviewing defendant at 1 p.m. Jonites advised defendant of his rights under *Miranda* before asking any questions.

The trial court reviewed the videotape and transcript of defendant's interview. At the beginning of the interview, the detectives informed defendant that only the prosecutor would decide whether defendant would be charged with a particular offense, and defendant consented to the recording. Defendant stated that in November 2001, he worked at his mother's bar with Schubat, who was in a volatile relationship with Neubauer, the deceased. Neubauer and Schubat had a young daughter and the couple was attempting to reconcile. However, in November 2001, defendant and Schubat began a romantic relationship. Three weeks later, Schubat told defendant that Neubauer would always be a part of her life unless "he was gone, if he was dead." Defendant initially ignored the topic, but after a few discussions, defendant told Schubat, "yeah, I could probably do like something. *** I'll even set it up. Don't worry about it, I'll end it. I'll take care of it for ya'." Defendant told Schubat that Ruhl would kill Neubauer, but Schubat was concerned that Ruhl was "not man enough" to follow through with the murder.

On the night of the shooting, defendant and Ruhl were speaking on their mobile phones. Defendant and Schubat were inside the bar and Ruhl was outside in the parking lot, where Neubauer was in his car waiting for Schubat. Defendant told the detectives that "I was being an idiot and I was telling [Ruhl] to go ahead and ***. do it. Just do it. Get it over with. Do it." Schubat overheard both sides of the conversation because defendant and Ruhl were using the direct connect feature of their Nextel phones.

Ruhl asked defendant whether he really wanted Neubauer killed, and defendant responded, "I don't wanna' hear nuttin'. All I wanna' hear is [sic] gunshots." Defendant did not believe that Ruhl would actually kill Neubauer, and defendant was shocked when he heard a gunshot outside. Defendant then looked out the window and saw Ruhl standing next to the driver's side window of Neubauer's car. At first glance, Neubauer appeared dead, but defendant saw his jaw quivering. Schubat drove home in her car, and defendant boarded up a broken window in the bar. Ruhl went to Neubauer's car, rolled Neubauer's body into the passenger seat, and drove the car to the Bristol Renaissance Faire in Wisconsin. Defendant followed Ruhl in his own car. Defendant was worried that Ruhl would kill him or someone else in his family if he did not cooperate.

Ruhl drove Neubauer's car into a fence, exited the car, and shot Neubauer's body several more times while it was still in the passenger seat. Ruhl then entered defendant's car, defendant saw Ruhl's gun for the first time, and the two drove away. Ruhl, who was wearing latex gloves, removed his sweater and T-shirt and wrapped the gun in the shirt. Ruhl put his sweater back on and told defendant to stop the car so he could place the gun under the hood.

Defendant and Ruhl drove to Zion and Waukegan to purchase cocaine, but they could not find anyone from whom to purchase drugs. Defendant and Ruhl bought beer instead, and they were stopped by a member of the Waukegan police department gang unit at approximately 4 a.m. The officer searched defendant, Ruhl, and the car but found only an open bottle of tequila in the trunk. The officer poured the tequila out and allowed defendant and Ruhl to drive away. Defendant drove Ruhl to the Dupree Hotel in Antioch, and Ruhl took the gun into one of the rooms. Defendant went home where he was living with Kristin Koets, his fiancée. At the time of the shooting, Ruhl owed defendant $2,500 for prior narcotics purchases, and Schubat stood to gain $20,000 from Neubauer's life insurance policy.

After reviewing the videotaped interview, the trial court denied defendant's first motion *in limine*, concluding that the detectives were credible and that defendant's statement was voluntary. The court found that defendant was unaffected by a lack of sleep and the Thorazine he claimed to have ingested. Moreover, the court rejected defendant's claim that he had requested an attorney before the interview, because defendant appeared at ease with the detectives, spoke freely with them during the interview, and never indicated a desire to speak with an attorney.

On May 20, 2003, defendant filed his second motion to suppress his statement. The second motion asserted that the police lacked prob-

able cause to stop the taxi and then detain defendant for 14 hours at the police station. Stating that "no additional testimony [was] necessary," defense counsel argued that, because defendant was seized from the taxi and not free to leave the interrogation room at the police station, he was in custody and under arrest even though he was later released after providing his statement. Therefore, counsel asserted, the exclusionary rule required the court to suppress defendant's statement because the officers lacked probable cause for the seizure.

The trial court disagreed, denying the second motion *in limine.* Although portions of the court's comments appear inconsistent, a review of the record indicates that the court found that probable cause existed to support an arrest on April 4, 2002, but that defendant had not been arrested.

At trial, the jury viewed defendant's videotaped interview with Detectives Jonites and Stanek. The State introduced the testimony of Schubat, Koets, Jonites, Stanek, and several others who corroborated the story defendant told during the interview. Stanek further stated that, several weeks before he questioned defendant, Stanek gave his business card to Barbaro, the woman who was with defendant on the night before the interview.

Barbaro testified that she met defendant and began a romantic relationship with him two or three weeks after Neubauer was murdered. In February 2002, Barbaro conversed with defendant about his involvement in the killing. Defendant described how he and Ruhl transported Neubauer to the Bristol Renaissance Faire in Kenosha. Defendant said that he shot Neubauer there because he was not yet dead. Defendant also explained that he and Ruhl left Neubauer to be discovered when the facility reopened in the spring and that defendant hid the gun under the hood of his car. Barbaro did not immediately notify the police of defendant's statements because she was scared and did not perceive an opportunity to contact the police. During a subsequent conversation, defendant told Barbaro that he and Ruhl wore gloves while moving Neubauer's body.

On March 27, 2002, after defendant told Barbaro of his involvement in the murder, the police stopped Barbaro for a traffic violation and arrested her on several outstanding warrants. Defendant was with Barbaro at the time and knew she had been arrested; but when she was alone with the officers, Barbaro requested to speak with the Lake County sheriff's department. Two days later, Barbaro informed the detectives of defendant's statements and agreed to assist in the investigation. Barbaro was briefly incarcerated; but upon her release, she went with defendant to the Best Western hotel on April 3, 2002, which was the day before defendant was taken to the police station for questioning.

The jury found defendant guilty of first-degree murder on an accountability theory and found him not guilty of first-degree murder as the principal. The trial court entered judgment on the jury's verdict on May 30, 2003.

On June 20, 2003, defense counsel moved for a judgment notwithstanding the verdict or a new trial. Counsel filed a first-amended motion on June 25, 2003. On July 2, 2003, the trial court ordered a psychological evaluation of defendant. On July 18, 2003, defense counsel filed a second-amended motion, the trial court heard and denied the motion, the court sentenced defendant to 50 years' imprisonment, defense counsel filed his first notice of appeal, and the court appointed the appellate defender to represent defendant. The trial court ruled that the notice of appeal would be "stayed" until defense counsel's postsentencing motion was decided.

On July 21, 2003, the trial court heard and denied defense counsel's motion to reconsider the sentence. Defendant filed a *pro se* motion alleging ineffective assistance of trial counsel, but the trial court declined to hear it, stating that the trial court lacked jurisdiction to do so. Defense counsel filed a second notice of appeal.

## ANALYSIS

On appeal, defendant does not challenge the sufficiency of the evidence. Instead, he argues that the trial court erroneously denied his second motion *in limine* to suppress his confession. Defendant further contends that the trial court committed reversible error by failing to dismiss his first notice of appeal under Supreme Court Rule 606(b) (188 Ill. 2d R. 606(b)) and address his posttrial claim of ineffective assistance of counsel. We conclude that the trial court did not err in admitting defendant's confession at trial but that a remand for the consideration of his claim of ineffective assistance of counsel is necessary.

### 1. Suppression Hearing

Before trial, defendant filed a motion to suppress his inculpatory statement that he made to the police on April 4, 2002. Defendant claimed that the police lacked probable cause to arrest him and that the statement he made after the arrest should be suppressed as the fruit of the poisonous tree. See *Wong Sun v. United States*, 371 U.S. 471, 486, 9 L. Ed. 2d 441, 454, 83 S. Ct. 407, 416 (1963). Following a hearing, the trial court denied the motion, finding that the officers had probable cause to arrest defendant for the charged offense even though they chose not to arrest him at that time. Defendant argues that he was, in fact, under arrest and that there was no probable cause to support the arrest. We need not determine whether defen-

dant's seizure on April 4, 2002, qualified as a formal arrest or a *Terry* stop (see *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)), because we conclude that the information Barbaro provided gave the detectives probable cause to arrest defendant.

■ Generally, a motion to suppress evidence presents mixed questions of law and fact; the trial court weighs the evidence and determines the facts surrounding the incident in question, after which it determines whether the facts constitute a violation of the defendant's rights. *People v. Thomas*, 198 Ill. 2d 103, 108 (2001). While the reviewing court defers to the trial court's factual findings, the trial court's ultimate ruling on a defendant's motion to suppress is reviewed *de novo*. *Thomas*, 198 Ill. 2d at 108. In considering a ruling on a motion to suppress, a reviewing court may consider evidence presented at trial as well as the evidence that was presented at the suppression hearing. *People v. Watson*, 315 Ill. App. 3d 866, 876 (2000). Therefore, we may consider Barbaro's trial testimony in determining whether there was probable cause to arrest defendant on April 4, 2002.

■ Probable cause to arrest exists where the totality of the circumstances known to the police officers at the time of arrest are sufficient to lead a reasonably prudent person to believe that the suspect has committed a crime. *People v. Patterson*, 282 Ill. App. 3d 219, 227 (1996). A police officer's knowledge of probable cause may be based on an informant's tip and, if the facts supplied in such a tip are essential to a finding of probable cause, the tip must be reliable. One indicium of reliability of information exists when the facts learned through police investigation independently verify a substantial part of the informant's tip. The reliability of the informant is another factor to be considered. *Patterson*, 282 Ill. App. 3d at 227.

■ During cross-examination, Barbaro admitted to several convictions and periodic incarceration. Barbaro had been convicted of drug conspiracy, forgery, obstruction of justice, and deceptive practices, and this criminal history undermines her credibility as an informant. However, her detailed knowledge of the crime and her corroboration of the information already possessed by the investigators rendered Barbaro reliable. Under these circumstances, we conclude that probable cause existed to arrest defendant on April 4, 2002, even though the detectives temporarily released him after he incriminated himself.

## 2. Postjudgment Motions

We next consider defendant's argument that the trial court erroneously failed to strike trial counsel's first notice of appeal and consider defendant's *pro se* claim of ineffective assistance of counsel. Defendant entitled his *pro se* motion "Motion for Ineffective Assistance

of Counsel" and alleged that trial counsel (1) elicited damaging testimony from two of the State's expert witnesses; (2) failed to request a fitness hearing and investigate defendant's mental condition; (3) failed to object to several unspecified remarks during the State's closing argument; (4) failed to object to the involvement of Assistant State's Attorney George Pappas, who was also prosecuting cases against key witnesses; (5) had a conflict of interest because he had worked in the State's Attorney's office in the past; (6) failed to investigate defendant's claim that the State's Attorney's office violated Rule 3.6 of the Rules of Professional Conduct (134 Ill. 2d R. 3.6); (7) failed to object to defendant's absence during the questioning of a prospective juror outside the courtroom; (8) failed to tender second-degree murder instructions; (9) failed to obtain medical records to prove that defendant is allergic to cocaine; (10) failed to obtain defendant's telephone records from December 2001 through January 2002; (11) failed to impeach a State witness with an eavesdropping recording she created in defendant's presence; (12) failed to provide defendant with the eavesdropping recording or a transcript thereof; (13) failed to put on a "realistic" defense; (14) filed motions to suppress that were inconsistent with a trial strategy that acknowledged the statement as true; (15) failed to retain experts on firearms and Thorazine; and (16) failed to investigate defendant's unspecified alibi or call unnamed alibi witnesses. Defendant argues that he is entitled to a remand to the trial court for a consideration of each of these allegations.

When a defendant is represented by counsel, he generally has no authority to file *pro se* motions, and the court should not consider them. *People v. Rucker*, 346 Ill. App. 3d 873, 882 (2003). An accused has the right either to have counsel represent him or to represent himself; but a defendant has no right to both self-representation and the assistance of counsel. *Rucker*, 346 Ill. App. 3d at 882. Therefore, a defendant is not entitled to " 'hybrid representation, whereby he would receive the services of counsel and still be permitted to file *pro se* motions.' " *Rucker*, 346 Ill. App. 3d at 882, quoting *People v. Handy*, 278 Ill. App. 3d 829, 836 (1996). There is an exception to this rule: represented defendants are allowed to raise *pro se* claims of ineffective assistance of counsel if they include supporting facts and specific claims. *Rucker*, 346 Ill. App. 3d at 883 (the defendant's bald allegation that counsel rendered inadequate representation was insufficient to meet the exception); see also *People v. White*, 322 Ill. App. 3d 982, 987 (2001) ("it contravenes human nature to expect counsel to adequately argue his own ineffectiveness" in a posttrial motion). Here, we conclude that defendant's claim of ineffective assistance of counsel is sufficiently detailed so as to meet the exception.

■ We next consider whether defendant's *pro se* motion was untimely as the State argues. Supreme Court Rule 606 (188 Ill. 2d R. 606) governs the perfection of appeals in criminal cases not involving guilty pleas. Rule 606(b) requires a notice of appeal to be filed with the clerk of the circuit court within 30 days after entry of the judgment appealed from or within 30 days after entry of an order disposing of a timely postjudgment motion. 188 Ill. 2d R. 606(b). Rule 606(b) further provides that, where a defendant's attorney or a defendant not represented by counsel files a timely motion directed against the judgment, a notice of appeal filed before disposition of that motion has no effect and shall be stricken by the trial court, regardless of whether the postjudgment motion was filed before or after the notice of appeal was filed. 188 Ill. 2d R. 606(b); *Rucker*, 346 Ill. App. 3d at 881-82.

The State concedes that Rule 606(b) required the trial court to strike the first notice of appeal, which was filed on July 18, 2003, because defense counsel filed a timely motion to reconsider the sentence three days later. The parties further correctly agree that defense counsel's second notice of appeal, which was filed on July 21, 2003, vested this court with jurisdiction over the appeal.

However, the State insists that defendant's *pro se* motion alleging ineffective assistance of counsel was an untimely successive posttrial motion. The State cites *People v. Miraglia*, 323 Ill. App. 3d 199 (2001), in which this court held, "Rule 606(b) contemplates the filing of only one postjudgment motion directed against the final judgment— whether it be the conviction or the sentence or both, but the rule does not authorize successive and repetitious motions raising issues that were raised earlier or could have been raised earlier and thereby extend the time for appeal." *Miraglia*, 323 Ill. App. 3d at 205.

The State's argument is a red herring because it focuses on the jurisdiction of the appellate court rather than the trial court. The trial court had jurisdiction over the cause at the time defendant filed his *pro se* motion because the motion was filed within 30 days of the July 21, 2003, denial of the motion to reconsider the sentence, which was the last jurisdictional act by the trial court.

In this case, the trial judge mistakenly believed that the first notice of appeal divested the trial court of jurisdiction. We addressed a similar mistaken conclusion in *In re Marriage of Agustsson*, 223 Ill. App. 3d 510 (1992). In *Agustsson*, the husband filed a postjudgment motion seeking to amend a dissolution judgment pursuant to section 2—1203 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1203 (now 735 ILCS 5/2—1203 (West 2002))). *Agustsson*, 223 Ill. App. 3d at 513. We held that the trial court's denial of the motion did not preclude the husband from filing a subsequent motion to vacate

the judgment. *Agustsson*, 223 Ill. App. 3d at 516. We noted that successive postjudgment motions are barred because they extend the time for a notice of appeal from a final judgment pursuant to Supreme Court Rule 303 (134 Ill. 2d R. 303), not because the trial court lacks jurisdiction to hear such a motion. *Agustsson*, 223 Ill. App. 3d at 517.

Although the jurisdictional issue in *Agustsson* was governed by Rule 303 rather than by Rule 606(b), we conclude that the logic applies equally here. The *trial court* has jurisdiction to rule on a successive postjudgment motion where the successive motion is filed within 30 days of the final disposition of the preceding postjudgment motion. Jurisdiction vests in the *appellate court* when the trial court disposes of the successive motion and a notice of appeal is filed within 30 days of the denial of the first motion attacking the judgment.

We disagree with the State's analysis and conclude that Rule 606(b) implicates the effect of a successive postjudgment motion on appellate jurisdiction. Rule 606(b) does not affect the trial court's jurisdiction over successive motions filed within 30 days of the trial court's most recent jurisdictional exercise. Here, the trial court had jurisdiction to consider defendant's *pro se* motion because the motion was filed on the same day that the first postjudgment motion was denied. We have jurisdiction to consider the appeal because the trial court disposed of the *pro se* motion and defendant filed the second notice of appeal within 30 days of the disposition of the first postjudgment motion.

■ Once a defendant files a timely and sufficiently detailed *pro se* motion alleging ineffective assistance of counsel, the trial court must conduct an adequate inquiry into the factual basis for the defendant's claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). If the defendant's claim is without merit or raises only matters of trial strategy, the court may deny the *pro se* motion without appointing new counsel. *Moore*, 207 Ill. 2d at 78. The supreme court has listed three ways in which a trial court may conduct its evaluation: (1) the court may ask trial counsel about the facts and circumstances related to the defendant's allegations; (2) the court may ask the defendant for more specific information; or (3) the court may rely on its knowledge of counsel's performance at trial and "the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78-79.

Where a trial court's inquiry into the defendant's allegations reveals that they are conclusory, misleading, or legally immaterial, and thus do not present a colorable claim of ineffective assistance of counsel, the court need not conduct further inquiry into the allegations. See *People v. Johnson*, 159 Ill. 2d 97, 128 (1994). Thus, we must decide whether the trial court conducted an adequate inquiry into

defendant's *pro se* allegations of ineffective assistance of counsel. See *Johnson*, 159 Ill. 2d at 125. Where the trial court undertakes no investigation of the defendant's *pro se* claim of ineffective assistance, a reviewing court must remand the cause to the trial court for that purpose. *Moore*, 207 Ill. 2d at 79.

In *Moore*, the supreme court found that the trial court's inquiry into the defendant's *pro se* motion was inadequate because the trial court did not consider the defendant's *pro se* motion at all. The motion never was denied; instead, the court simply allowed it into the record, so it could be considered later on appeal. *Moore*, 207 Ill. 2d at 79. This case is factually indistinguishable, as the trial court placed defendant's *pro se* motion into the record but declined to hear it after incorrectly concluding that jurisdiction had vested in the appellate court.

The State argues that this case is more like *People v. Burks*, 343 Ill. App. 3d 765 (2003), an Appellate Court, First District, case that postdates *Moore* but does not cite it. In *Burks*, the defendant claimed that the trial court failed to inquire into three *pro se* allegations of ineffective assistance of counsel. However, the appellate court noted that the defendant never filed a written motion and made only unsupported oral assertions at the sentencing hearing, which was held nearly four months after he was convicted. *Burks*, 343 Ill. App. 3d at 775. The appellate court affirmed the defendant's conviction but not before analyzing each of his three allegations and holding each to be without merit. *Burks*, 343 Ill. App. 3d at 775-77.

The State's reliance upon *Burks* is misplaced. In this case, defendant filed a written motion setting forth several alternative theories of ineffective assistance of counsel. The State correctly notes that judgment was entered on the verdict on May 30, 2003, but defendant did not file his *pro se* motion until July 21, 2003. The State repeatedly emphasizes defendant's delay in filing his motion as grounds for denying him a hearing on it. However, the transcripts of the hearings during that period illustrate that trial counsel failed to follow through on defendant's desire for a transcript of the trial, which he hoped to use to prepare his *pro se* motion. Furthermore, it appears that the court refused to order the transcript unless defendant set forth his allegations with particularity. The State asserts that defendant should be denied a hearing on his numerous allegations of ineffective assistance of counsel because he did not file a written request for the transcript himself. However, under these facts, we conclude that it would be unfair to declare defendant's claim of ineffective assistance untimely simply because his counsel, already alleged to have been ineffective, failed to request a trial transcript.

Accordingly, we conclude that the trial court erred in failing to conduct the necessary preliminary examination as to the factual basis of defendant's allegations against his appointed trial counsel. " '[W]e emphasize that we are not remanding for a full evidentiary hearing and appointment of counsel on the issue of trial counsel's incompetence.' " *Moore*, 207 Ill. 2d at 81, quoting *People v. Parsons*, 222 Ill. App. 3d 823, 831 (1991). Instead, we remand the cause for the limited purpose of allowing the trial court to conduct the required preliminary investigation. If the court determines that the claim of ineffectiveness is spurious or pertains only to trial strategy, the court may deny the motion and leave defendant's conviction and sentence in place. See *Moore*, 207 Ill. 2d at 81. If the trial court denies the motion, defendant may still appeal his assertion of ineffective assistance of counsel along with his other assignments of error. See *Moore*, 207 Ill. 2d at 81-82.

For the preceding reasons, the cause is remanded to the circuit court of Lake County for proceedings consistent with this disposition.

Remanded with directions.

McLAREN and HUTCHINSON, JJ., concur.