2021 IL App (1st) 181822-U

No. 1-18-1822

Order filed June 30, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | Nos. 13 CR 15517-19 |
| | ) | |
| NORRIS BOSTON, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions are affirmed where the trial court properly denied defendant's motion to quash arrest and suppress evidence.

¶ 2    Three separate indictments in case numbers 13 CR 15517, 13 CR 15518, and 13 CR 15519[1], charged defendant Norris Boston with committing a total of 71 sex-related offenses

---

[1]Pursuant to the State's motion for joinder, all three cases were joined without objection.

against three minor children, sisters D.M.I, Y.M, and D.M.II,[2] between August 1, 2012, and July 16, 2013. Prior to defendant's bench trial, the State nol-prossed multiple counts. The court convicted defendant on all remaining counts and ultimately sentenced him to natural life imprisonment on nine separate Class X charges of predatory criminal sexual assault (720 ILCS 5/11-1.40(A)(1) (West 2012)), four years' imprisonment on one Class 1 charge of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2012)), and three years' imprisonment on one Class 2 charge of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(B) (West 2012)).

¶ 3    For the following reasons, we affirm.[3]

¶ 4                                    I. BACKGROUND

¶ 5                                    A. Motion to Suppress

¶ 6    On March 2, 2017, defendant filed a motion to quash arrest and suppress evidence in this matter. The motion alleged that defendant was arrested in the absence of probable cause and sought to suppress inculpatory statements made by him and the contents of his cellular phone.

¶ 7    A hearing was held on defendant's motion on May 16, 2017. Sergeant Sarah Vanthof testified that while on duty on July 16, 2013, at 4:30 p.m., an individual named Melvin Cruz (Cruz) arrived at the 25th police district to report a criminal sexual assault. Cruz showed Sergeant Vanthof photographs of young girls that depicted genitalia. Cruz provided the names of the children. Cruz told Sergeant Vanthof that his tenant, defendant, sent Cruz the photographs and informed Cruz that he had sex with one of the girls. Cruz provided defendant's address of 2158 North Kilpatrick

---

[2]Two of the named victims and another sister bear the same first and last initials and are referred to in descending age as "D.M.I", "D.M.II", and "D.M.III".

[3]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

Avenue and informed Sergeant Vanthof that defendant resided with the victims at this address for over three weeks.

¶ 8 Sergeant Vanthof then conducted a name check and learned that defendant violated the Sex Offender Act (730 ILCS 150/3(a) (West 2012); 730 ILCS 150/10(a) (West 2012)) by not registering 2158 North Kilpatrick Avenue as his current address. Sergeant Vanthof conveyed this information to Officer Casey Nolan and instructed him to go to 2158 North Kilpatrick Avenue to arrest defendant. Sergeant Vanthof did not delay to obtain an arrest warrant, for she believed that the victims could be at home with the alleged offender.

¶ 9 Detective Casey Nolan testified that at 6:30 p.m. on July 16, 2013, while he was employed as a police officer with the Chicago Police Department[4], Sergeant Vanthof informed him that defendant was a named suspect in a predatory criminal sexual assault of at least one minor female. Detective Nolan knew that defendant's cellular phone contained possible child pornography and that defendant, a registered sex offender, failed to register his current alleged address of 2158 North Kilpatrick Avenue.

¶ 10 While assisting officers went to the front door of 2158 North Kilpatrick Avenue, Detective Nolan and his partner, Officer Rondon Solis, went to the rear door of the residence. After the assisting officers knocked on the front door, defendant was arrested, *Mirandized*, and transported to the 25th police district.

¶ 11 After the evidence, the court found:

"THE COURT: All right. The Court's had an opportunity to observe the demeanor and assess the credibility of the two witnesses who testified and, of course, take

---

[4] Detective Nolan was later promoted to detective.

into consideration the arguments of counsel. So the situation that I've heard is that on July 16th of 2013, police received information from Mr. Cruz about some images that were sent to him from Mr. Boston, some allegedly pornographic images of children, children's genitalia, and that's what led Mr. Cruz to the police, to notify the police of this suspected pornography. And the police then did a name check, and there was -- they found out that the defendant was subject to the Sex Offender Registry and that the address he was registered at was different from the address that Mr. Cruz said that Mr. Boston, the defendant, was living.

Mr. Cruz, from what I've heard, was the landlord, and Mr. Boston was the tenant. I heard that defendant, at least from Mr. Cruz, the information that Mr. Cruz gave to the police, defendant was living at this address, new address for over three weeks, and that's information that Sergeant Vanthof got. Based on the information that she got, Detective Nolan was dispatched, sent out to that residence at about 6:30 in the evening, still, you know, late afternoon, evening. And the defendant was taken into custody outside the residence, I guess in the porch area. There was no warrant. He was arrested outside.

A couple of things here. He wasn't -- since he wasn't arrested inside his home, the lack of a warrant is not really an issue here. I don't know if an investigative alert really -- what an investigative alert is. It really isn't anything of any constitutional validity, but the case law is that an arrest may be had outside someone's residence with probable cause here. And I've heard here that this citizen,

individual, Mr. Cruz, made a report of suspected child pornography and suspected child sexual abuse.

And, also, the secondary issue is that the police had probable cause that Mr. Boston was living in violation of his obligations under the Sex Offender Registration Act. I think under the information the police had, there was probable cause both of a suspected child sexual abuse, certainly some sort of dissemination of child pornography, and also that Mr. Boston was living in violation of his sex offender registration obligations. Based on that, I cannot say that the Fourth Amendment -- Mr. Boston's Fourth Amendment Rights were violated in the act -- the way that police took him into custody. Moreover, when they came in, they went to the -- well, they came to the residence. He was Mirandized. He wasn't asked where he was living and then he gave that information. They seized him, took him into -- they Mirandized him. And the statements that he made that he was living there were given after he was Mirandized. It certainly wasn't something that the police tried to sandbag him here, at least not from what I've heard here.

Now, as far as his cell phone that is recovered off the defendant, I've heard just -- and I didn't hear anything factually during the motion here, during the hearing on the motion. I just heard through argument -- because when I asked the State that once the cell phone was seized by the police, later on the police got a search warrant to open up the cell phone or to retrieve information off that cell phone.

So based on what I've heard here, I cannot say that the Fourth Amendment was violated. Now, obviously, if there's some other motion regarding the recovery of those images, certainly the defense can certainly file that; but based on what I've heard here, the defendant's motion is respectfully denied."

¶ 12                              B. The Trial

¶ 13    Defendant's bench trial commenced on October 11, 2017. Sergeant Sarah Vanthof testified that on July 16, 2013, Melvin Cruz arrived at the 25th police district and showed her three screenshots of photographs on his cellular phone. The photographs depicted two young females, who appeared to be between 9 and 14 years of age and showed exposed genitalia. Cruz told Sergeant Vanthof that defendant, his tenant, sent the photographs to him.[5] The three photographs, which showed the girls posing with their genitalia and buttocks exposed, were admitted in evidence.

¶ 14    Cruz told Sergeant Vanthof, that defendant's date of birth, was January 5, 1989, and that defendant resided at 2158 North Kilpatrick Avenue. Sergeant Vanthof used this information to conduct a name check that revealed defendant was a registered sex offender on the Illinois State Police website and that defendant's registered address was not listed as 2158 North Kilpatrick Avenue. After making these observations, Sergeant Vanthof instructed Officer Casey Nolan to determine whether defendant was at the 2158 North Kilpatrick Avenue address.

¶ 15    Detective Nolan testified that on July 16, 2013, Sergeant Vanthof directed him to go to 2158 North Kilpatrick Avenue to locate defendant for failing to register his correct address and possibly having child pornography on his cellular phone. At approximately 4 p.m., Detective

---

[5]Cruz was also indicted but died before his trial in this matter.

Nolan, his partner, Roldon Solis, and other assisting officers went to the apartment building at 2158 North Kilpatrick Avenue. Detective Nolan went to the rear of the apartment and was in radio contact with the assisting officers monitoring the front of the residence. When defendant exited the rear door, Detective Nolan arrested him.

¶ 16   Detective Nolan read defendant his *Miranda* rights, and after defendant said that he understood those rights, he told Detective Nolan that he resided at the apartment but had not registered at that address. Defendant removed a cellular phone from his pocket and attempted to give it to someone in the residence, but Detective Nolan recovered it and later gave it to Detective Ian Barclay.

¶ 17   At the police station, defendant was interviewed by detectives Barclay and Manuel De La Torre. At approximately 10:58 p.m., after being *Mirandized* and again indicating that he understood his rights, defendant told the detectives that he did not register as a sex offender because he could not afford the $20 registration fee. When defendant was asked about the pornographic images on Cruz's phone, defendant requested a lawyer, and questioning ceased. At approximately 11:20 p.m., defendant waved to Detective De La Torre from a window in the room where defendant was being held, Detective De La Torre opened the door, and defendant requested to speak to Detective Barclay.

¶ 18   Defendant then told Detective Barclay that he wanted to talk "because Cruz had set him up." Defendant was again *Mirandized* and, after again acknowledging his rights, told the detectives that he had about seven photographs of himself having sex with his girlfriend, Y.M., and her little sister. Defendant signed a written consent form allowing the detectives to view his phone.

Defendant entered the passcode for his phone and showed Detective Barclay photographs of the girls, identifying them by name and age.

¶ 19    Defendant referred to Y.M. as his "girlfriend" and identified a photograph of D.M.I that showed liquid on her pelvic area where "he nutted on her." Defendant admitted putting his penis and finger in Y.M.'s vagina, putting his penis in her mouth, and putting his mouth on her vagina when Y.M. was 10 and 11 years old. Defendant knew Y.M.'s age, having given her a Justin Bieber birthday card and $20 when she turned 11 years old. Defendant said that when he put his penis in Y.M.'s vagina, she told him that it hurt, so he "jacked off" and "came on her stomach." Both before and after Y.M. was 11 years old defendant penetrated her vaginally. Defendant said that he put his mouth on Y.M.'s vagina around seven times "[b]ecause she liked that."

¶ 20    Defendant said that D.M.I was 13 years old, and he provided her date of birth. Defendant admitted putting his penis and finger in D.M.I's vagina and said that the last time he penetrated her with his finger was the day of his arrest, July 16, 2013. When D.M.I told defendant that it hurt when he put his penis in her vagina, defendant masturbated until he ejaculated.

¶ 21    Defendant told the detectives that he put his finger in D.M.II's vagina when she was 8 years old.

¶ 22    Defendant also told the detectives that Cruz offered defendant money if he took photographs of himself having sex with the minors. Cruz told defendant that he would sell the photographs on the internet for $25,000.

¶ 23    Former ASA Colleen Rogers testified that she was assigned to the felony review unit of the Cook County State's Attorney's Office on July 17, 2013. Ms. Rogers *Mirandized* defendant and ultimately reduced his oral statement to a typewritten document which defendant corrected

and signed. The statement was admitted at trial in its entirety. We now summarize the contents of defendant's statement.

¶ 24 Defendant admitted that he began residing with B.M. and her daughters at 4710 West Dickens Avenue in August of 2012; and lived with them at 2158 North Kilpatrick Avenue from July 1, 2013, until his arrest. Defendant never updated his registered address because he lacked the money to obtain an updated state I.D.

¶ 25 Defendant became involved in a relationship with Y.M. when she was 10 years old. Y.M. agreed to be his "girlfriend." Defendant admitted that Y.M. performed oral sex on him and that he performed oral sex on her. Defendant attempted to have vaginal sex with Y.M., but he stopped when she told him that it hurt. Defendant also touched Y.M.'s vagina with his finger but stopped when she told him that also hurt. Defendant bought Y.M. a pair of thong underwear from Target and gave it to her to wear. He took a photograph of her wearing the thong.

¶ 26 Defendant admitted committing multiple sexual acts with 13-year-old D.M.I. Just before D.M.I's thirteenth birthday, D.M.I performed oral sex on defendant. Defendant also attempted to put his penis in D.M.I's "butt," but stopped when D.M.I told him that it hurt. Defendant touched D.M.I's vagina with his hand and put his finger in her vagina.

¶ 27 Defendant told ASA Rogers that on July 16, 2013, defendant was alone with D.M.I and D.M.III when D.M.I performed oral sex on him. Defendant took a photograph of this on his cellular phone. Defendant also performed oral sex on D.M.I and took photographs of D.M.I on the bed with her vagina and buttocks exposed. Defendant masturbated and ejaculated in D.M.I's vaginal area and took a photograph that showed defendant's semen.

¶ 28    Defendant told ASA Rogers that when D.M.II was 9 years old, he rubbed her vagina inside the lips but did not "go into the hole." Defendant said that D.M.II smiled when he did this, and he believed "it felt good to her."

¶ 29    Defendant said that he had sexual contact with 8-year-old D.M.III. On one day in March of 2013, defendant rubbed D.M.III's vagina with his hand. Defendant rubbed D.M.III's vagina inside the lips but did not "go into the hole," and D.M.III "seemed to enjoy when he did this to her because she was smiling."

¶ 30    On July 15, 2013, defendant texted Cruz to find out whether Cruz received the $100 defendant owed him for rent. Cruz told defendant to find some girls who were 18 years old and willing to make porn movies. Cruz then called back and asked defendant to find girls who were 14 or 15 years old, "the younger, the better." When defendant said that he could only find one girl, D.M.I, and that she was 13 years old, Cruz asked defendant to "send a picture of her p***."

¶ 31    Cruz kept encouraging defendant to send more photographs and told defendant that he would make "big money" from them and that no one would see them in Chicago because they would be sold overseas. Cruz said that D.M.I agreed to pose for the photographs.

¶ 32    After his arrest, defendant requested an attorney but later knocked on his cell door and asked to speak to Detective Barclay. Defendant told Detective Barclay that he wanted to waive his right to an attorney and speak with him. Defendant also gave the police consent to search his phone because he wanted them to be able to recover all of the photographs and text messages exchanged between him and Cruz. Defendant felt that he should not take all of the blame because Cruz was the person who "started it and he wanted Marvin to get in trouble, too."

¶ 33    ASA Rogers testified that defendant identified the screenshots of photographs contained in People's Exhibits Nos. 2 and 5, taken from the cellphones of Cruz and defendant, respectively. ASA Rogers testified to handwritten notations that defendant made next to the images contained on these two exhibits.

¶ 34    The notations made by defendant on People's Exhibit No. 2, reflect the identification of "[D.M.I]" next to a screenshot of a photograph of a young girl posing nude on a bed with her legs spread open; "[D.M.I]" next to a screenshot of a photograph of the same young girl with her buttocks and right breast exposed; and "[Y.M.]" next to a screenshot of a photograph of a second young girl displayed wearing a bra and thong with her buttocks exposed.

¶ 35    The notations on People's Exhibit No. 5, the images from defendant's phone reflect defendant's identification of "[D.M.I] & me" next to the screenshot of a photograph of a young girl with a penis in her mouth, "[D.M.I] 13" next to the screenshot of a photograph depicting defendant and the same young girl, "Nut my [D.M.I]" next to a photograph of the same young girl's exposed genitalia, and "[Y.M] 11 girlfriend" next to a screenshot of a photograph of a second young girl.

¶ 36    The victims also testified at trial. D.M.I testified that she was 17 years old at the time of trial and had three sisters, D.M.II, Y.M., and D.M.III. D.M.I lived with her sisters, their mother, B.M., and her father, Mr. M. When D.M.I was 12 years old, defendant, whom the family referred to as "Junior," lived with them. The family's landlord, Melvin Cruz, also lived in the same building.

¶ 37    D.M.I recounted how defendant touched her private parts with his fingers on more than one occasion and that it "hurt." D.M.I further testified that on more than one occasion defendant

touched the inside of her vagina with his mouth and, while armed with a knife he held by his side, repeatedly threatened to kill D.M.I and her entire family. Defendant also put his "peanuts," which she described as what he used to "pee" in D.M.I's mouth and private part. The first time that defendant put his penis in D.M.I's private part, she was 12 years old. The last time that defendant put his penis in her private part, she was 13 years old. Defendant also put his penis inside her butt and did not stop when she told him that it hurt. The day that defendant was arrested, he touched her private part with his mouth and took photographs of her on his cellular phone.

¶ 38    D.M.I identified photographs depicting her and Y.M., including photographs that revealed D.M.I's "private parts" and "butt," defendant putting his penis inside D.M.I's mouth, and defendant's "sperm" appearing on B.M.'s lower stomach area. D.M.I identified the photograph that displayed Y.M. wearing "thongs and a bra" that defendant made her don. These photographs were transferred to a DVD and admitted in evidence at trial.

¶ 39    D.M.I described another incident when she saw defendant photograph Y.M. in the bra and thong he gave her. Defendant told Y.M. that he was going to marry Y.M. when she turned 18 years old. D.M.I saw defendant post a photograph of him and Y.M. on Facebook. D.M.I saw defendant touch Y.M.'s private part and saw "sperm" come out of it. D.M.I never told anyone about these events until she was in eighth grade when she told a counselor what had happened. The day that defendant was arrested, D.M.I told people what defendant did to her.

¶ 40    Y.M. testified that she was 15 years old at the time of trial. When Y.M. was 10 years old, she saw defendant put his private part in D.M.I's private part. Y.M. described "private parts" as what people used to "pee." Defendant put his private part in Y.M.'s mouth, and when "white stuff" came out, it went in Y.M.'s mouth. Defendant told Y.M. that if she told anyone, he would kill her

and her whole family. Defendant had a knife in his hand when he said this, and Y.M. believed him. Defendant also removed Y.M's clothes and put his private part inside her private part. Y.M. testified that this happened ten times and that it hurt. The last time that it happened, Y.M. was 11 years old. When Y.M. was 10 years old, defendant also put his finger inside her private part more than once, and it felt "nasty and hurted." Defendant told everyone that Y.M. was his wife.

¶ 41    Y.M. also identified the photographs that depicted her and D.M.I. Y.M. was 10 years old when defendant gave her a thong and a bra, instructed her to put them on, and took photographs of her wearing them. Defendant made D.M.I take off her clothes and strip on a flagpole in B.M.'s room. Y.M. also saw defendant touch D.M.II's private part when their father was incarcerated. Y.M. told defendant to let D.M.II go, or she would call the police. Defendant then grabbed a knife and tried to stab Y.M. Y.M. never told anyone about defendant's actions until after he was arrested.

¶ 42    D.M.II testified that she was 13 years old at the time of trial. When she was 8 years old, defendant touched the inside of her private part with his whole hand, and it hurt. She described her private part as what she used to "pee." This happened more than once. Defendant told D.M.II that if she told her mom and dad, he would kill her whole family. Defendant had a knife in his hand when he said this to her, and she believed him.

¶ 43    B.M. testified that she was 39 years of age at the time of trial and that in 2012 she and her daughters resided at 2158 North Kilpatrick Avenue. Melvin Cruz was their landlord. B.M. was friends with defendant's mother, and she allowed defendant to live with her family from August of 2012 until the day of his arrest because she needed someone to help her watch her children while her husband was incarcerated.

¶ 44     On July 16, 2013, B.M.'s husband, Mr. M., was released from custody and returned to reside with his family. That day, Cruz called and spoke with Mr. M. The police came to the building and arrested defendant. Cruz showed B.M. and Mr. M. photographs of D.M.I and Y.M. on his cellular phone. The photographs were date-stamped July 7, 2013. B.M. described the child pornographic nature of what was depicted in the photographs.

¶ 45     Outside the presence of the police, B.M. and Mr. M. talked to their girls individually. All three girls made outcries that coincided with their courtroom testimony. All three girls said they did not tell B.M. what defendant had done because defendant threatened to kill their whole family and was armed with a knife when he issued the threats.

¶ 46     The children were subsequently examined by Dr. Emily Sifferman and interviewed at the Children's Advocacy Center (CAC). The forensic interviews of D.M.II and Y.M. were admitted in evidence.

¶ 47     Dr. Emily Sifferman testified about the physical examinations that she performed on the children and her interviews with each of them. Swabs were taken from D.M.I to determine the presence of semen.

¶ 48     D.M.I told Dr. Sifferman that defendant had sex with her and that "he made him stick his potty part in me." Dr. Sifferman testified that D.M.I clarified that she was referring to her genital area as the part of her body that defendant put his "potty part" inside, and that defendant's actions hurt her. D.M.I told Dr. Sifferman that defendant also put his potty part in her mouth and that white "sperm" came out and landed on her stomach. D.M.I reported that the last time this conduct occurred was the previous day, July 16, 2013.

¶ 49    Dr. Sifferman's examination revealed that D.M.I's vaginal area was missing hymenal tissue and revealed eczema and an adhesion, which Dr. Sifferman described as tissue stuck together. An adhesion forms when an area of the body is inflamed. Dr. Sifferman opined that the cleft or notch in D.M.I's hymen derived from an old injury and was specific for previous penetrating trauma. Based on the foregoing, Dr. Sifferman concluded that D.M.I was sexually abused.

¶ 50    Y.M. told Dr. Sifferman that defendant said that "she was his wife," that defendant touched her sister, gave her thong underwear, threatened to kill her if she told anybody, and said that he would make her have sex with his friend for $100. Y.M. said that defendant tried to have sex with her but that it hurt. Y.M. also reported that defendant tried to kiss D.M.III on the mouth and threatened to kill Y.M. if she told anyone.

¶ 51    D.M.II told Dr. Sifferman that defendant touched her butt and touched her genital area with his hand.

¶ 52    Dr. Sifferman opined that although the physical examinations performed on Y.M. and D.M. were normal, these findings were consistent with the girls' reported histories. Dr. Sifferman testified that the results of a physical examination might appear normal because abusive behavior may not leave an injury, or an injury may have healed by the examination time.

¶ 53    Additionally, the parties stipulated that forensic scientist Karen Abbinanti conducted Y chromosome PCR/STR DNA analysis on extracted DNA generated from a buccal standard collected from defendant and compared it with a Y chromosome PCR/STR DNA analysis generated from the oral swabs containing the presence of semen collected from D.M.I.

Ms. Abbinanti concluded that a human Y-STR DNA haplotype identified in the mixed fraction of the extracted DNA from the oral swabs of D.M.I matched defendant's Y-STR DNA haplotype.

¶ 54 Also admitted in evidence were extensive text messages between defendant and Cruz recovered from Cruz's cellular phone. The text messages essentially established that Cruz and defendant were involved in an ongoing scheme wherein defendant would take pornographic photographs of Y.M. and B.M. and provide them to Cruz for sale on the internet. The text messages were replete with details and established that defendant had been sexually abusing the girls for almost a year and included defendant's statement that "I tried to f*** my wife, but she said it hurt."

¶ 55 Additionally, a certified statement of conviction from March 3, 2008, for aggravated criminal sexual abuse in case number 2007 CF 151 was admitted in evidence. The parties stipulated that defendant entered a plea of guilty to this offense, which involved defendant's act of putting his penis in the vagina of an 11-year-old victim. Additionally, defendant's identity as the perpetrator, in that case, was supported by DNA evidence.

¶ 56 After the State rested, defendant testified that in July of 2013, he lived at 2158 North Kilpatrick Avenue. Defendant testified that he only resided at this address for fourteen or fifteen days before being arrested. Defendant lived with B.M., Mr. M., and their children, D.M.I, Y.M., D.M.II, and D.M.III. Defendant denied ever threatening any of the children or having sexual contact with any of them.

¶ 57 After being arrested and taken to a small room, defendant asked for an attorney. Defendant alleged that the police initiated a conversation with him after his request. Defendant was presented with a typewritten statement by an ASA that he signed but never read. Defendant was intoxicated at the police station, having smoked two and a half "blunts" of marijuana and snorted three lines

of powder cocaine. Defendant knew at the time of his arrest that he was going to the "county" for failing to register as a sex offender.

¶ 58    On cross-examination, defendant admitted that upon being released from the Illinois Department of Corrections on June 21, 2012, he was supposed to reside at 2502 West Division Street. Defendant admitted that he resided with B.M.'s family for 11 months, both at 2158 North Kilpatrick Avenue and at another address before that time. Defendant denied taking naked photos of D.M.I and denied that his penis was depicted in the photograph that showed a penis in D.M.I's mouth. Defendant admitted that his cellular phone contained the photographs identified at trial but claimed to leave his phone at B.M.'s home every now and then when he went to the store and alleged that Cruz had access to his phone. Defendant did not recall sending the text messages to Cruz.

¶ 59    In finding defendant guilty of all counts, the court indicated that there was an "overwhelming mountain of evidence against Mr. Boston," that defendant's testimony "was entirely, absolutely unbelieve, incredible," and that the State proved defendant's guilt's "more" than beyond a reasonable doubt.

¶ 60    Defendant filed a motion for new trial and argued that the State failed to prove defendant's guilt beyond a reasonable doubt. Defendant did not allege that the trial court erred in denying his motion to quash arrest and suppress evidence. The trial court denied defendant's motion.

¶ 61    The court subsequently sentenced defendant to natural life imprisonment on nine separate Class X charges of predatory criminal sexual assault (720 ILCS 5/11-1.40(A)(1) (West 2012)), four years' imprisonment on one Class 1 charge of criminal sexual assault (720 ILCS 5/11-

1.20(a)(2) (West 2012)), and three years' imprisonment on one Class 2 charge of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(B) (West 2012)).

¶ 62    Defendant filed a timely notice of appeal.

¶ 63                                II. ANALYSIS

¶ 64    On appeal, defendant's sole contention of error is that the trial court erroneously denied his motion to quash arrest and suppress evidence. While defendant admits that he did not preserve this claim, we address it because the State has not argued forfeiture. *People v. Smith*, 2018 IL App (1st) 151402, ¶ 6.

¶ 65    It is well settled that a person may be arrested without a warrant when a police officer has reasonable grounds to believe that a person has committed a crime. 725 ILCS 5/107–2(1)(c) (West 1992). The statutory standard is the same as the constitutional requirement of probable cause. *People v. Tisler*, 103 Ill. 2d 226, 243 (1984). The applicable test is whether a reasonable person, having the knowledge possessed by the officer at the time of the arrest, would believe that the defendant committed the offense. *Id.* at 237; *People v. Holloway*, 131 Ill. App. 3d 290, 305 (1985). Probable cause is not proof beyond a reasonable doubt but a probability of criminal activity; indeed, it is unnecessary for the State to show that it was more likely true than false that defendant was involved in criminal activity. *People v. Hopkins*, 235 Ill. 2d 453, 472 (2009). "Thus, the existence of possible innocent explanations for the individual circumstances or even for the totality of the circumstances does not necessarily negate probable cause." *People v. Geier*, 407 Ill. App. 3d 553, 557 (2011). In evaluating whether an officer has probable cause to arrest a defendant, the focus is on probabilities and should not be unduly technical in deciding whether probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 235-36 (1983). Rather, the focus is on the practical,

common-sense considerations that govern the actions of reasonable and prudent people. *Hopkins*, 235 Ill. 2d at 472.

¶ 66    In general, the reliability of an ordinary citizen, in contrast to an informant, need not be established; that is, absent indications to the contrary, information provided by an ordinary citizen is presumed to be reliable. *People v. Jones*, 374 Ill. App. 3d 566, 574 (2007). Probable cause may also be based on an informant's tip if it is shown to be reliable by demonstrating the informant's past reliability or by independently verifying a substantial part of the tip. *People v. Serio*, 357 Ill. App. 3d 806, 814 (2005).

¶ 67    In reviewing a trial court's ruling on a motion to quash, we give due weight to the trial court's inferences and uphold its findings of historical fact unless they are against the manifest weight of the evidence. *People v. Hackett*, 2012 IL 111781, ¶ 18. We review *de novo* the ultimate question of whether the evidence should be suppressed. *Id*. ¶ 18. We are not limited in our review to the evidence from the motion hearing but may also consider the trial evidence. *People v. Richardson*, 234 Ill. 2d 233, 252 (2009).

¶ 68    Here, defendant relies on several inapposite cases involving anonymous tipsters. *People v. Sparks*, 315 Ill. App. 3d 786 (2000); *People v. Yarber*, 279 Ill. App. 3d 519 (1996); *People v. Maxey*, 2011 IL App (1st) 10011; *People v. Brown*, 343 Ill. App. 3d 617 (2003). This case does not concern an anonymous tipster but a self-identified individual who walked into a police station and voluntarily produced information concerning a crime.

¶ 69    Nor does this case resemble *People v. Jackson*, 348 Ill. App. 3d 719 (2004), where the court determined that the witness supplied insufficient evidence to provide the officer with reasonable suspicion to conduct a *Terry* stop of defendant and for his ultimate arrest. *Id*. at

729-30. Here, the police had probable cause to believe that defendant was violating the terms of the Sex Offender Act (730 ILCS 150/3(a)(1); 730 ILCS 150/10(a) (West 2012)) by failing to provide his current address. It is uncontroverted that defendant knowingly failed to register his 2158 North Kilpatrick Avenue address, where he testified to this fact at trial.

¶ 70    While defendant avers that additional corroboration is required when a civilian witness is eventually charged as a codefendant, we do not believe that this fact, standing alone, necessarily triggers a requirement of additional corroboration. Our conclusion finds support in the fact that an individual's arrest that is unsupported by probable cause may subsequently be validated by intervening probable cause that arises from incriminatory statements made by a codefendant that are reliable and legally obtained. *People v. Wilberton*, 348 Ill. App. 3d 82, 89-90 (2004); *People v. Klimawicze*, 352 Ill. App. 3d 13, 20 (2004). Here, while it is true that Cruz was subsequently charged as a codefendant, the record does not contain any suggestion that Cruz's encounter with the police was inherently unreliable or unlawfully obtained where Cruz went to the police station of his own volition to apprise the authorities of defendant's criminal activities.

¶ 71    Nevertheless, even if the general presumption of reliability for an ordinary citizen did not apply, we would still conclude that Cruz's information was sufficiently detailed and readily verifiable to provide probable cause for defendant's arrest. Cruz did not merely allege that defendant sexually assaulted a child but substantiated his claim by providing defendant's name, date of birth, and address, by displaying child pornographic images of the identified children on his cellular phone, and by identifying himself as the landlord of the building where the children and defendant resided. To be clear, based on our review of the record, the images contained in People's Exhibit # 2 were unquestionably properly regarded by Sergeant Vanthof as indicative of child pornography and required an immediate response by the authorities.

¶ 72    Even if further corroboration was required, however, Sergeant Vanthof acquired it when she used defendant's date of birth and address, as reported by Cruz, to identify defendant as a currently registered sex offender who failed to provide his correct registered address. Taken in conjunction with the information provided by Cruz, defendant's status as a sex offender provided probable cause to believe both that defendant violated the terms of the Sex Offender Act (730 ILCS 150/3 (a)(1); 730 ILCS 150/10(a) (West 2012)) by failing to provide his place of residence, possessed child pornography on his cellular phone, and had reoffended by committing another sexual offense against a child.

¶ 73    Additionally, while not required, probable cause was further heightened when, in response to the police arriving at 2158 North Kilpatrick Avenue and knocking on the front door, defendant attempted to quickly depart from the residence through the rear door. The law requires no more. The evidence established probable cause to arrest defendant.

¶ 74                                III. CONCLUSION

¶ 75    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 76    Affirmed.